

# SEALED

FILED

2014 FEB 18 PM 2:49

### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | **Filed in Camera** |
| **ex rel. TERRENCE SCOTT, Relator,** | § | **and Under Seal** |
| | § | |
| | § | **Pursuant to 31 U.S.C. § 3730(B)(2)** |
| | § | |
| **v.** | § | **Civil Action No. SA 13-CA-1055-FB** |
| | § | |
| **SAVASENIORCARE** | § | **DO NOT PLACE ON PACER** |
| **ADMINISTRATIVE SERVICES,** | § | **DO NOT SERVE DEFENDANTS** |
| **LLC,** | § | **DO NOT PLACE IN PRESS BOX** |
| | § | |
| **Defendant.** | § | |
| | § | |

## RELATOR'S FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, AND DEMAND FOR JURY TRIAL

1.        This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent, continuous claims made, used, and caused to be made, used, or presented, by SavaSeniorCare Administrative Services, LLC ("Sava") and/or its agents, employees, and co-conspirators (herein collectively referred to as "Defendant"), from at least 2009 to 2012, and, upon information and belief, to the present, in violation of the federal False Claims Act ("FCA").

2.        The FCA provides that any person or entity that knowingly submits, or causes the submission of, a false or fraudulent claim to the United States government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. The FCA defines "knowingly" to include acts committed with "actual knowledge," as well as acts committed "in deliberate ignorance" or

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **1** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 1 of 36 PageID #: 55

·in "reckless disregard" of their truth or falsity. Liability attaches when a defendant seeks, or causes others to seek, payment that is unwarranted from the government. The FCA allows any person having information about a false or fraudulent claim against the government to bring an action for him or herself and the government, and to share in any recovery.

3.      Medicare Part A pays skilled nursing facilities ("SNFs") a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients, most of whom have chronic diseases, are unable to independently manage day-to-day activities, and do not have sufficient family support to live at home or with family. Medicare payment to the SNFs depends on the rehabilitation needs of the beneficiaries and the amount of service furnished to the beneficiaries as a result. The highest daily rate that Medicare Part A will pay a SNF is for patients requiring "Ultra High" levels of skilled rehabilitation therapy, or 720 or more minutes per week of skilled therapy from two or more therapy disciplines (physical, occupational, or speech). Part A also pays for "Very High" levels of skilled rehabilitation therapy for patients who are prescribed 500 minutes a week of therapy given by at least one discipline. The number of therapy minutes each patient needs to meet or achieve a RUG level is determined using a "look back" or observation period, also called an "assessment reference date" ("ARD"). The level of skilled rehabilitation therapy, as well as the relevant ARD, is submitted to CMS to determine payment. TRICARE pays nursing facilities using the same system as Medicare Part A.

4.      In some circumstances, Medicare Part B covers inpatient SNF services where Medicare Part A payment is not available. Part B also covers therapy services furnished by SNFs to their inpatients who have exhausted Part A benefits, or who are otherwise not eligible for Part A benefits, on an outpatient basis. Under Medicare Part B, payment is made under the Physician

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **2** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 2 of 36 PageID #: 56

Fee Schedule, and is based on the amount of units of therapy provided (which is based on the number of minutes of therapy).

5.      As set forth in more detail below, Sava purposely bills Medicare and, upon information and belief, TRICARE, for services that are not covered by the skilled nursing facility benefit, that are not medically reasonable and necessary, and that are not skilled in nature. Sava engages in a systematic scheme to maximize the number of days it billed Medicare at the Ultra High and Very High levels under Part A, setting aggressive targets that are unrelated to patients' actual conditions, diagnoses, or needs. Sava reinforces these targets by, for example, requiring that clinicians at underperforming facilities (*i.e.*, facilities with lower-than-desired Ultra High RUG rates) email their supervisors to explain why any patient did not qualify for the Ultra High RUG category. Sava also reinforces these targets by having their Rehab Program Managers audit Medicare patients' charts and, without seeing the patient or even speaking to the clinicians who have, requiring clinicians to add extra therapy and additional disciplines. Therapists are discouraged, however, from seeing a patient for more than the minimum range of minutes required to achieve the desired RUG score. Sava also, on information and belief, engages in these practices with respect to its TRICARE patients.

6.      Similarly, Sava purposely bills Medicare for Part B services that are not medically reasonable and necessary. It engages in a systematic scheme to maximize the number therapy units it bills under Part B, setting therapy unit targets that are unrelated to patients' actual conditions, diagnoses, or needs. Sava also reinforces these targets by having their Rehab Program Managers audit Medicare Part B patients' charts and, without seeing the patient or even speaking to the clinicians who have, adding additional therapy minutes to capture additional

·units and achieve budgeted Medicare Part B reimbursements.

7.       Sava accordingly knowingly submitted or caused to be submitted false claims to the Medicare and TRICARE programs for medically unreasonable and unnecessary therapy services, and used false records and statements to support those false claims.

## I. PARTIES

8.       Relator Terrence Scott is an occupational therapist, and worked as a staff therapist and Rehab Program Manager at Sava's Retama Manor North and South locations from September 2009-April 2012. Mr. Scott is licensed in Texas, where he resides. As a therapist, his responsibilities included following the treatment plans as written by the evaluating therapists; providing specified treatment one-on-one with the patient; documenting and reporting the patients' progress to the therapist; and, meeting Sava's "productivity" requirements.

9.       As a manager, Mr. Scott's job duties included scheduling all therapists' visits, including setting their frequency and duration; reviewing Sava's internal reports to meet budget projections; attending daily meetings with building department managers; meeting with the MDS office to discuss Medicare Part A RUG projections; processing orders for therapy evaluation recommendations; and carrying a patient caseload to meet a 50% "productivity" expectation.

10.      Mr. Scott was terminated as a result of his refusal to engage in, and his attempt to correct, Sava's fraudulent practices of inflating its Medicare patients' RUG scores and therapy units in order to maximize reimbursement.

11.      While his facility did not have a contract to treat TRICARE beneficiaries, other Sava locations did.

12.      Defendant SavaSeniorCare Administrative Services, LLC, is a privately-held

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **4** of **36**

·Delaware company headquartered in Atlanta, Georga. Its registered agent for service of process is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801. Sava owns and/or operates more than 180 nursing homes in Alabama, California, Colorado, Connecticut, Georgia, Illinois, Maryland, Massachusetts, Michigan, Mississippi, North Carolina, Nebraska, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, Wisconsin, and Wyoming.

13.     Sava facilities treat Medicare, Medicaid, TRICARE, and private-pay patients. Like other SNFs, most of Sava's patients have chronic diseases, including COPD, diabetes, heart disease, and dementia; suffer from incontinence; have difficulty with independently and safely managing activities of daily living; and lack sufficient family support or resources to live at home or with family.

## II. LEGAL BACKGROUND

### A. The False Claims Act

14.     The FCA prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the federal government. 31 U.S.C. § 3729(a)(1)(A). The FCA also prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, *id.* at § 3729(a)(1)(B), as well as knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. *Id.* at § 3729(a)(1)(G).

15.     A person acts "knowingly" under the FCA when he or she "(i) has actual

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **5** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 5 of 36 PageID #: 59

knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). No proof of specific intent to defraud is required by the FCA. *Id.* at § 3729(b)(1)(B).

16.    FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim, plus three times the amount of damages sustained by the Government as a result of Sava's illegal conduct. 31 U.S.C. § 3729(a).

**B. Medicare**

17.    Medicare is a federally-funded health insurance program benefiting the elderly, disabled, and those afflicted with end-stage renal disease. 42 U.S.C. § 1395 *et seq.* It is administered by the Center for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS").

18.    The Medicare program is divided into four parts, each of which cover different services. Medicare Part A, or hospital insurance, covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care. Medicare Part B, or "supplementary medical insurance," generally covers medical expenses not covered under Part A, primarily physician and outpatient expenses.

19.    Medicare may not pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (a)(1)(A).

20.    SNF services must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **6** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 6 of 36 PageID #: 60

·of medical practice; and must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.25.

21.     SNFs submit Medicare claims to Medicare contractors (Fiscal Intermediaries (FIs) and/or Part A/B Medicare Administrative Contractors. 42 C.F.R. §§ 1395h, 1395kk-1.

**1. Medicare Part A**

22.     Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care per benefit period (or spell of illness). A benefit period must follow a qualifying hospital stay of 3 or more consecutive days, and must start within 30 days of the hospital stay. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §§ 409.61(b), (c), 409.30(b)(1).

23.     Medicare Part A SNF coverage is limited to beneficiaries who require skilled nursing or skilled rehabilitation services, or both, on a daily basis. 42 C.F.R. § 409.31(b)(1). "The daily skilled services must be ones that, as a practical matter, can only be provided in a SNF, on an inpatient basis." *Id.* at § 409.31(b)(3). The services must also be provided to address the condition for which the patient received treatment during a qualifying hospital stay, or for one that arose while the patient was receiving care at an SNF. *Id.* at § 409.31(b)(2). In addition, a physician, or certain nurse practitioners, clinical nurse specialists, or physician assistants, must certify and recertify that the SNF services meet the requirements above. 42 U.S.C. § 1395f(a)(2)(B).

24.     "To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Skilled therapy services means services that "(1) Are ordered by a physician; (2) Require the skills of technical or professional personnel such as

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **7** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 7 of 36 PageID #: 61

·registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists; and (3) Are furnished directly by, or under the supervision of, such personnel." 42 C.F.R. § 409.31(a); *see also* Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

25.     Personal care services and repetitious exercises to improve gait, or to maintain strength and endurance, as well as assistive walking care are not skilled services. Medicare Benefit Policy Manual, Chapter 8, at § 30.4.1.2.

26.     Medicare Part A pays nursing facilities a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare beneficiaries. These Prospective Payment System ("PPS") payments are based on a pre-determined daily rate for each day of care. 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

27.     The daily payments to SNFs are determined by adjusting a base payment rate for geographic differences and case mix. The case-mix adjustment is done using "Resource Utilization Groups," or "RUGs," which account for different nursing and therapy weights. RUGs differ by the kinds of services the SNF furnishes to the patient (*e.g.*, the kind and amount of therapy), the patient's clinical condition, and the patient's need for assistance to perform activities of daily living.

28.     There are five rehabilitation RUG levels: Ultra High ("RU" for "RUG Ultra High"); Very High ("RV"); High ("RH"); Medium ("RM"); and Low ("RL"). SNFs classify patients into a RUG using information it gathers in a standardized patient assessment instrument, the Minimum Data Set ("MDS"). A patient falls into a specific RUG level based on the number of skilled therapy minutes, and the kinds and numbers of therapy disciplines the patient received

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **8** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 8 of 36 PageID #: 62

·during a seven-day assessment or "lookback" period.

29.    RUG category requirements are set out below:

RU:    720 or more therapy minutes per week; at least 2 disciplines, with one discipline required at least 5 days/week.

RV:    500 or more therapy minutes per week; at least 1 discipline for five or more days per week.

RH:    325 or more therapy minutes per week; at least 1 discipline provided five or more days per week.

RM:    150 or more therapy minutes per week; 5 days per week of any combination of disciplines.

RL:    45 or more therapy minutes per week; 3 days per week of any discipline.

30.    The above-listed RUGs are further categorized based on ADL scores, which evaluate daily living activities such as eating, toileting, and mobility, and as well as whether the patient requires extensive services.

31.    The RUG system "uses minimum levels of minutes per week as qualifiers for classification into the rehabilitation therapy groups. These are minimums and are not to be counted as upper limits for service provision." 64 Fed.Reg. 41,644, 41,662 (July 30, 1999).

32.    Medicare Part A pays the most for patients that fall into the RU category. This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. at 26,258.

33.    Prior to 2012, four or fewer patients in a group could receive group therapy by a therapist, and the amount of time the patients were treated in the group counted fully towards each patient's weekly total, provided that these minutes did not amount to 25% or more of the

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **9** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 9 of 36 PageID #: 63

patient's weekly therapy in that discipline. 64 Fed.Reg. 41,662. In 2012, CMS changed this policy, noting that it "create[d] an inappropriate payment incentive to perform group therapy in place of individual therapy[.]" 76 Fed. Reg. 48,511. Since 2012, group therapy minutes have been allocated between the patients, meaning that the SNF can no longer count total minutes spent in therapy for each patient in the group. *Id.* at 48,512-48,517.

34.     SNFs are required to assess and complete the MDS form on – or, in some cases, before or after – the 5th, 14th, 30th, 60th, and 90th days (the ARDs) of the patient's Part A stay. 42 C.F.R. § 413.343. The assessment looks at the seven days preceding the ARD, "looking back" at the amount and kinds of therapy the patient required. This information is put in the "Special Treatments, Procedures, and Programs" section of the MDS (Section P of the MDS 2.0, and Section O of MDS 3.0), and directly impacts the rehabilitation RUG level – and therefore the SNF's payment – to which the patient is assigned.

35.     Providers completing the MDS must certify that it "accurately reflects resident assessment information" and that "this information was collected in accordance with applicable Medicare and Medicaid requirements." They must also certify that "I understand that this information is used as a basis . . . for payment from federal funds . . . [and that] payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information."

36.     Currently, SNFs must transmit the data directly to CMS within 14 days of the assessment. 42 C.F.R. § 483.20(f)(3), *id.* at § 413.343(a). Prior to October 1, 2009, SNFs electronically transmitted the MDS form to a state's health department or other agency, 42 C.F.R. § 483.20(f)(3) (2006), which in turn sent the data to CMS.

37.     Completion and submission of the MDS is a condition of payment. *See* 63 Fed. Reg. at 26,265, 42 C.F.R. § 413.343(a).

38.     The RUG score is also incorporated into a Health Insurance Prospective Payment System (HIPPS) Code, a 5-character code, consisting of the 3-digit RUG score and a 2-digit assessment indicator, used solely to bill Medicare for the Part A SNF stay. *See* Medicare Claims Processing Manual, Ch. 25, § 75.5. The HIPPS code is filled out on the MDS as well as electronically submitted as a claim for payment to CMS on the CMS-1450 form. The CMS-1450 form is submitted electronically to the appropriate Medicare Administrative Contractor, which processes and pays the Medicare claim.

39.     CMS-1450 requires providers to certify that the information is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Form CMS-1450 (emphasis in original).

**2. Medicare Part B**

40.     "Medicare Part B pays for outpatient physical therapy services furnished to an inpatient of a hospital, CAH, or SNF who requires them but who has exhausted or is otherwise ineligible for benefit days under Medicare Part A." 42 C.F.R. § 410.60(b); *see also* Medicare Benefit Manual, Ch. 15, § 220.1.4; Medicare Claims Processing Manual, Ch. 7, § 10.

41.     Items or services provided to a Part B beneficiary must be reasonable and

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **11** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 11 of 36 PageID #: 65

· medically necessary. *See* 42 U.S.C. § 1395y(a).

42.     Part B payments are based on a fee schedule for the specific items or services provided. 42 U.S.C. § 1395yy(e)(9); Medicare Claims Processing Manual, Ch. 23, § 30. They are not, contrary to Part A payments, based on a daily rate. "[W]here a fee schedule exists for the type of service, the fee amount will be paid. Where a fee does not exist on the Medicare Physician Fee Schedule (MPFS) the particular service is priced based on cost." Medicare Claims Processing Manual, Ch. 7, § 10.2; *see also* Medicare Claims Processing Manual, Ch. 23, § 30.

43.     Part B SNF claims are submitted on CMS-1450 using Healthcare Common Procedure Coding System (HCPCS) codes to report the number of units for outpatient rehabilitation services. 42 C.F.R. § 424.32; Medicare Claims Processing Manual, Ch. 7, § 20, *id.* at Ch. 23, §§ 20.3, 30; Medicare Claims Processing Manual, Ch. 5, § 20.2. HCPCS codes are based on CPT codes, Medicare Claims Processing Manual, Ch. 23, § 20.

44.     There are two types of HCPCS therapy codes: timed and untimed. Untimed codes are based on the number of times a procedure is performed in a day. Medicare Claims Processing Manual, Ch. 5, § 20.2. Time-based codes, such as outpatient therapy service codes, allow for variable billing that is based on 15-minute increments, where each increment is one (1) billing unit. *Id.* A provider can only bill for units of time that are spent in direct contact with the patient. *Id.*

45.     In 1998, Medicare established and published its own requirements regarding these time-based 15 minute codes. *Id.* At the heart of these requirements is the 8-minute rule, which dictates that in order to bill for each additional time-based code, the therapist must spend at least eight (8) minutes of each unit providing direct service to the patient. The breakdown of these

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **12** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 12 of 36 PageID #: 66

· units is as follows:

| Units | Number of Minutes |
|-------|-------------------|
| 1 unit: | $\geq$ 8 minutes through 22 minutes |
| 2 units: | $\geq$ 23 minutes through 37 minutes |
| 3 units: | $\geq$ 38 minutes through 52 minutes |
| 4 units: | $\geq$ 53 minutes through 67 minutes |
| 5 units: | $\geq$ 68 minutes through 82 minutes |
| 6 units: | $\geq$ 83 minutes through 97 minutes |
| 7 units: | $\geq$ 98 minutes through 112 minutes |
| 8 units: | $\geq$ 113 minutes through 127 minutes |

46.    "All Part B claims for services furnished to SNF residents (whether filed by the SNF or by another entity) must include the SNF's Medicare provider number and appropriate HCPCS coding." 42 C.F.R. § 424.32(a)(5). Providers must certify the accuracy and completeness of the information contained on the CMS-1450. *See supra* at ¶ 39.

47.    Under Medicare Part B, CMS makes retrospective payments through MACs to Medicare providers for patient services.  A MAC will review and approve claims submitted for reimbursement by Medicare providers and makes payments on those claims which appear to be eligible for reimbursement under the Medicare Program.

**3. Medicare Cost Reports**

48.    Providers are required to submit cost reports on an annual basis, and must certify the . 42 C.F.R. §§ 413.20(b), 413.24(d), (f). SNFs paid under the PPS may file a simplified cost report. 42 C.F.R. § 413.321.

**C.  TRICARE**

49.    TRICARE (formerly CHAMPUS) is a federally-funded medical benefit program providing healthcare benefits to, among others, active duty service members, retired service

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **13** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 13 of 36 PageID #: 67

·members, and their dependents. 10 U.S.C. §§ 1071-1110.

50.     TRICARE covers the same skilled nursing services as Medicare, and reimburses providers in the same manner. 10 U.S.C. §§ 1079(j)(2) (institutional providers). TRICARE only covers "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. 199.4(a)(1)(i).

51.     TRICARE follows Medicare's PPS and RUG systems, and beneficiaries are assessed using the same MDS form used by Medicare. TRICARE Reimbursement Manual 6010.5M, Ch. 8, §2, 4.3.5-4.3.7, 4.4.3. TRICARE does not limit the number of days a patient may get SNF care. 32 C.F.R. § 199.4(b)(3)(xiv).

52.     Some TRICARE beneficiaries who are enrolled in Medicare are still eligible for TRICARE ("dual eligible beneficiaries"). In this circumstance, TRICARE is the secondary payer to Medicare, and TRICARE is responsible to the SNF for any amounts not covered by Medicare. *Id.* at 4.4.

53.     TRICARE considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud. 32 C.F.R. § 199.9(c)(5).

54.     Such practices are also deemed abusive because they cause financial loss to the United States. 32 C.F.R. § 199.9(b). "To avoid abuse situations," TRICARE providers are obligated to provide services and supplies  that are "[f]urnished at the appropriate level and only when and to the extent medically necessary[.]" *Id.* "[A]buse situations under CHAMPUS are a sufficient basis for denying all or part of CHAMPUS cost-sharing of individual claims." *Id.* "Abuse" specifically includes "[a] pattern of claims for services which are not medically

necessary or, if medically necessary, not to the extent rendered." *Id.* at § 199.9(b)(3).

55.     Because Medicare is the primary payer for dual eligible beneficiaries, TRICARE follows Medicare's determination regarding medical necessity. If services are determined not to be medically necessary under Medicare, they are not covered under TRICARE. TRICARE Reimbursement Manual 6010.58M, Ch. 8, § 2, 4.3.16 (Note).

### III. FACTS RELATING TO ALL COUNTS

**A. Sava Systematically Pressures and Requires its Employees and Facilities to Meet Corporate Ultra High and Therapy Unit Targets to Maximize Medicare and TRICARE Revenue**

56.     Because Medicare Part A and, where applicable, TRICARE, pays SNFs more money for Ultra High RUG beneficiaries, Sava requires and incentivizes its facilities and therapists to get as many patients into this category as possible, regardless of the true medical needs or condition of its patients. Sava's Rehab Program Managers instruct, for example, their therapists to "push our part A's to play with us in the first week or so. [We] need Ultra's!!!"

57.     Similarly, because Part A and TRICARE pay per diem rates, Sava requires and incentivizes its facilities and therapists to keep patients' lengths of stay as long as possible, giving push back if patients are discharged before their 60th day; they are also instructed by regional management and Rehab Program Managers to use at least two therapy disciplines on Medicare Part A patients in order to maximize reimbursement. *See, e.g., infra at ¶ 67.*

58.     These practices result in patients receiving kinds and levels of therapy that are not medically reasonable or necessary, and result in patients unnecessarily exhausting all 100 covered SNF days, leaving them without Medicare Part A SNF coverage until the next benefit period, or 60 days after leaving inpatient SNF care. 42 C.F.R. § 409.60(b)(1).

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **15** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 15 of 36 PageID #: 69

59.    Furthermore, as a result of these practices, Sava therapists often do not develop individualized plans of care for their patients, instead using pre-printed, generic care plans and pre-set Daily Activity Schedules to maximize therapy minutes and reach the desired RUG level.

60.    With respect to Medicare Part B outpatient therapy services, Sava requires and incentivizes its employees and facilities to "capture additional units" by adding therapy minutes, extra visits, and additional therapy disciplines to achieve their budgets and maximize reimbursement, all without regard to the actual needs and abilities of the patients.

### 1. Sava's Patient-Level Tracking and Fraudulent Reimbursement Maximization Practices

61.    Sava employs patient-level tracking reports to look for opportunities to add therapy to maximize revenue. One such report, the ROX report, tracks all patient therapy treatment data, and generates other reports designed to maximize RUG levels and Medicare Part B Units. One such ROX-generated report, the ROX Key Indicators Report, tracks RUGS and the number of days the patient has been receiving treatment. It also generates reports to the manager indicating if the building was above or below company expectations.

62.    With respect to Medicare Part B patients, when a therapist nears, but does not reach, the next therapy unit – and therefore the next reimbursement level – the facility's Rehab Program Manager, discussed further *infra* at ¶ 76, receives an email from the Regional Rehab Director indicating that the therapist missed the next unit by a specified number of minutes, and instructing the Rehab Program Manager to speak with the therapist about achieving the next unit in the future.

63.    Another such report, the Daily Activity Schedule ("DAS"), dictates how much therapy a patient should receive based on the RUG level Sava wishes to bill for this patient. This

report is put together by the Rehab Program Manager, not the therapist, and uses the ROX system to identify how many minutes and disciplines are needed to get a patient to an RU. For each day in the week before the ARD, the DAS notes, in bold, the ARD date to cue the treating therapist that they must deliver the time listed without fail so that the patient can achieve the desired RUG in the assessment. The DAS reports are not part of the patient chart. Some printed DAS reports are destroyed at the end of the day, while others were kept for a month or longer, depending on the office.

64.     These reports are used by Sava management to make patient-level chart changes designed to maximize reimbursement. Rehab Program Managers, for instance, use the ROX reports to audit patient charts and change therapy units, ARD days, and disciplines to maximize reimbursement under Medicare and, upon information and belief, TRICARE.

65.     On February 27, 2012, for example, Cristian Olivares, a Rehab Program Manager, audited the Medicare patient charts at Sava's Pleasanton branches to find ways to increase revenue with respect to Medicare patients.

66.     For Part A patient E.A., for instance, Mr. Olivares pointed out that the patient's RUG went from an RV to RH "because only one discipline stayed on the case & on 7 day lookback, the RV was forfeited to an RH." He suggested that the facility Rehab Program Manager "discourage only one discipline remaining on case."

67.     Part A patient E.B. was originally an Ultra High RUG patient, but later fell to Very High RUG patient after speech language pathology therapy stopped. Mr. Olivares recommended increasing physical and occupational therapy minutes "to keep the RU going until the 30 day ARD." That is, Mr. Olivares wanted to ensure that the next ARD resulted in the

patient getting another RU; if therapy minutes decreased, the ARD could result in a lower RUG score for the patient, and Sava would receive less Medicare reimbursement.

68.     For another Part A patient M.F., Mr. Olivares noted that "Your OT pulled out Feb 8[th]. Only PT stayed on the case. What is the rationale ??? This is a very detrimental practice to your facility's reimbursement & your department's metrics... You went from RV --> RM --> RH. On 2/21 missed the RH by 17 minutes !"

69.     For some other Part A patients, like L.P., Mr. Olivares removed minutes from the patients' plans so that the therapists were not treating patients more than the minimum number of minutes for their RUG. Patient LP was an RU with 800 scheduled minutes; Mr. Olivares, who had never seen the patient, determined that the patient should instead receive five fewer daily therapy minutes than the treating therapist determined were necessary and appropriate to treat the patient. Mr. Olivares wanted to avoid an "overage," or more minutes than desired from a profit perspective.

70.     For Part B patients, Mr. Olivares actually changed the therapy times listed in the patient charts to "capture an additional unit and come closer to achieving . . . budgets." For Part B patient F.C., he changed the therapy projections from 60 to 70 minutes, explaining that "If the patient can tolerate 60 minutes, it's likely they can tolerate an additional 8-10 minutes." Mr. Olivares had, upon information and belief, never met, treated, or evaluated this patient. He nevertheless made the change, and recommended that the facility "justify another discipline with this patient . . . And all Part B patients." As a result, Sava could bill for additional units of therapy, receiving more Medicare reimbursement.

71.     For Part B patient E.W., Mr. Olivares changed the therapy minutes from 40

minutes per day to 70; for Part B patient A.C., he changed the therapy from 50 to 70. He also remarked "why not 53[?]," referring to the unit – and therefore payment – increase associated with 53 minutes of therapy (4 units of therapy) versus 50 (3 units). Ultimately, 70 minutes of therapy would enable Sava to bill for two extra units of therapy – units the treating therapist did not determine were medically necessary or reasonable – for E.W.

72.     For Part B patient D.Q., Mr. Olivares was pleased with the number of services (3) that the patient received ("that's the way to make your budget & to best serve the patient"), yet he "amended the minutes . . . because the projections were not set to the strongest possibilities." He changed them all to 70 minutes.

73.     He concluded his "ROX Audit" by noting that facilities should "*STOP ALLOWING DISCIPLINES TO PULL-OUT OF THE CASE AND LEAVE ONLY ONE DISCIPLINE SEEING A MEDICARE PART A PATIENT*." (Emphasis in original). Patients with only one discipline cannot qualify for RU status. *See supra* at ¶ 45.

74.     Mr. Scott received this ROX Audit by mistake from Wanda Martinez, Regional Rehab Director for Sava's South Central Region. Once he reviewed it, he undid Mr. Olivares' changes to the patients' care plans. Upon information and belief, however, similar audits are routine, and have resulted in similar changes that were not corrected, and therefore resulted in fraudulently inflated and unnecessary claims for reimbursement to Medicare.

75.     Sava also requires therapists to explain any RUG scores below RU. Facilities in Sava's Central Region that did not meet RUG targets were required, for example, to email Wanda Martinez, for each patient who, at the 5- or 14-day assessment, is not assigned to the Ultra High RUG, explaining "why the patient is unable to do so."

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **19** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 19 of 36 PageID #: 73

76.    Each Sava facility has a Rehab Program Manager who is responsible for scheduling staff and patients; patient screening; and coordinating PRN staff. Beginning in September 2009, Relator Terry Scott was the Rehab Program Manager at Sava's Ratama Manor locations in Pleasanton, Texas. As set out in additional detail below at Section IV, Mr. Scott was unwilling to be pressured to engage in the fraudulent conduct at issue in this case, and took a voluntary demotion to staff therapist on August 1, 2012.

77.    Rehab Program Managers report to a Regional Manager, who reports to a District Manager. District Managers report to the VP of Rehabilitation out of the Atlanta, Georgia main office, who in turn reports to the President of Sava, Tony Oglesby.

78.    Rehab Program Managers are responsible for managing the therapy staff and for ensuring that they meet the Ultra High RUG targets, as well as length-of-stay and therapy unit targets. And although Regional and District Managers have no contact with patients, they pressure therapists and Rehab Program Managers to reach these targets.

79.    Facilities also employ an MDS coordinator who collects the MDS-required information and determines the ARD. Rehab Program Managers, however, are instructed by Sava to overrule the MDS coordinator and choose ARDs that result in the highest RUG level to maximize Medicare and, upon information and belief, TRICARE reimbursement.

80.    As described above, Sava tracks RUG level, therapy units, and length of stay in detailed reports. These reports also track facilities' performance with respect to their budget goals for RUG level, therapy units, and length of stay.

81.    One such report, the Daily Management Tool (or the "Part B & RU Tracker")

monitors facility revenue levels for rehab on a daily basis. Under the "Part B Focus" section, projected and budgeted units – and the difference between the two – are listed for each facility on the sheet. The tool also specifies "Units Needed per day to make budget by month's end," "# of patient I need to ID today & start Rx on to meet budget," # of pt's needed over BUDGET to meet budget," "Budgeted # of part B patients to see per day," "Units needed per day to make budget," and "Tot[al] Part B patients potential in bldg."

83. This same tool also tracks Medicare Part A RUGs with a section called "RU Focus." This section tracks the month's actual RUs, the month's budgeted RU%, and the difference. Other sections track Rehab Utilization and Rehab Productivity, comparing actual vs. budgeted amounts for each.

83. Underperforming facilities are listed together, and lower-than-acceptable Part B figures are color-coded. A predicted total of Medicare Part B reimbursement over or under budget is listed as well. Facilities listed in red on the tool are underperforming facilities that require "focus calls" with management to focus on plans to maximize Medicare revenue.

84. At the regional level, budgets are tracked by trimester. These tracking documents track trimester budgeted amounts, as well as the monthly amounts needed to reach the trimester budget, for the following categories: "Rehab Utilization %," "Rehab Distribution%" (tracking patients falling into the different RUGs), "Rehab Medicare A Rate" (tracking a per-diem target reimbursement figure), "Medicare B $" (tracking Medicare Part B revenue by therapy discipline), and "Medicare B Units" (tracking units by discipline).

85. VPs, PRDs, and Rehab Program Managers receive bonuses based on their trimester and annual performance relative to these budgets. In 2010, for example, a Rehab

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **21** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 21 of 36 PageID #: 75

Program Manager was eligible to receive a 10% bonus, 7.5% based on trimester results, and 2.5% based on annual results. At the trimester level, Rehab Program Managers' bonus target was to reach 50% of the desired RUG distribution of Medicare Part A patients, and 25% of long-term care (LTC) therapy utilization.

86.    With respect to LTC therapy utilization, Rehab Program Managers can achieve a bonus even if they fall short of the expected measure in the event that they "Achieve Part B dollars (actual versus budget) OR Do not achieve Part B Dollars, but Exceed the Rehab Medicare A Revenue by [the] amount missed on the Part B budget."

87.    For example, a Rehab Program Manager would achieve a bonus qualifier if he "Missed Part B by $5,000, Exceeded Medicare A Revenue by $3.12 and had 2000 Rehab Medicare Days [because] 2000 x $3.12 = $6,240." Where, however, he only "Exceeded Medicare A Revenue by $1.00 and had 2000 Rehab Medicare Days" he would not receive a bonus, as "2000 x $1.00 = $2,000." In other words, so long as the Rehab Program Manager was able to maximize federal reimbursement, he could qualify for a bonus, regardless of whether the funds came from Part A or Part B.

88.    Other reports summarize profits and losses across the company. One report, the "Rehab P&L" report, calculates "EBITDARMI" with respect to RUGs and Medicare Part B, and lists the actual, budget, and variance value and percentage for each Sava facility.

89.    Another spreadsheet contained in the same file as the Rehab P&L report lists "STRATEGIES FOR IMPROVEMENT" for selected measures on the P&L report. In order to improve "RUG's Distribution," for instance, the reader is instructed to "Adjust treatment time to meet RUG target." That is, to increase RUGs, and therefore reimbursement, facilities and

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **22** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 22 of 36 PageID #: 76

therapists should increase treatment time, regardless of whether it medically reasonable or necessary.

90.     These reports enable Sava to reward profit over patient care, and allow regional-level managers to hold underperforming facilities and employees accountable for failing to adhere to Sava's profit-maximization business model. The result is reimbursement maximization without regard to the patients' actual medical needs or the reasonableness of the amount and kinds of services provided to them.

**B. Sava's Improper Use of Group Therapy and Unskilled Care to Increase Medicare Reimbursement**

91.     Sava placed patients into group therapy, where therapists engaged in unskilled activities with them, in order to maximize Medicare reimbursement.

92.     Sava routinely placed four patients together and, for example, had patients eat pudding cups and billed for it as skilled speech therapy. Nursing assistants and activities aides also performed these activities with patients, but when Sava therapists engaged in these activities with patients in a group setting of four patients, they were able to bill Medicare for four hours of therapy – one hour per patient, even though only one hour was actually spent performing activities – until 2012.

93.     To incentivize the utilization of group therapy, Sava Rehab Program Managers received bonuses based on their annual group therapy treatments.

**C. Limited Physician Oversight, Knowledge, or Involvement in Care Planning**

94.     Medicare requires attending or SNF-staff physicians with knowledge of the case to sign certifications of medical necessity and appropriateness of the kinds and frequency of

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **23** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 23 of 36 PageID #: 77

therapy. Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 80. If a physician refuses to certify that the patient needs skilled care as required by the Medicare rules, the services are not covered. Medicare Benefit Policy Manual, Ch. 8, § 40.

95.  "Certifications must be obtained at the time of admission, or as soon thereafter as is reasonable and practicable." *Id.* Routine admissions orders are not a certification. *Id.*

96.  At Sava, physician certifications and recertifications are often only obtained 30-60 days after the patient was admitted and started receiving therapy, usually by a doctor who stopped by the facility to sign a stack of certifications at a time, approximately every few weeks. Oftentimes they are signed by a doctor who is unfamiliar with the patient, without any meaningful review of the information contained in the plans of care or patient chart.

97.  Had the physicians been familiar with the patient, and properly reviewed the patient record and plans of care, they would have realized that most of the therapy plans of care were identical, as Sava utilizes standardized care plans for its patients, regardless of their individual needs or circumstances.

98.  Each discipline at Sava had its own generic care plan form; the evaluating therapist fills in the patient's name and the evaluation date. Therapists usually declined to fill in any other patient-specific information, and the exact same goals were used for each patient.

99.  As a result of both the lack of serious physician involvement and standardized plans of care, Sava patients did not get the benefit of treatment and plans tailored to their specific conditions and needs; instead, they received generic care designed to maximize Sava's reimbursement.

**D. Sava's False Statements and Submissions to Medicare and TRICARE**

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
FILED UNDER SEAL
Page **24** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 24 of 36 PageID #: 78

100. At all times relevant to this Complaint, defendant submitted Medicare claims to an intermediary or MAC, who then submitted claims for payment to Medicare.

101. Upon information and belief, Sava submitted claims for payment to Medicare electronically through its fiscal intermediaries or MACs.

102. In order to do so, it was required to enter into an Electronic Data Interchange ("EDI") Enrollment Agreement, whereby defendants agreed to "submit claims that are accurate, complete, and truthful[.]" It acknowledged that

> all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law[.]

103. To the extent that it did not submit claims electronically, it submitted paper claims on Form CMS-1450 (UB-04), each of which contained the following certification and/or acknowledgement:

> **Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.**

They also contained the following notice:

> **UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).**

(emphasis in original).

104.    Defendant also filed an annual cost report with its intermediaries. It, through its administrator or CFO, was required to certify as follows:

> I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning ___ and ending ___ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42 C.F.R. § 413.24(f)(4)(iv).

105.    As set out above, defendants' certifications were false. Their cost reports were not truthful because the cost information contained in the reports were not true and accurate, and instead were corrupted by upcoded and fraudulent claims designed to increase Medicare revenue. They were not correct because defendants were not entitled to reimbursement for the reported costs under Medicare rules and regulations. They were not complete, as the reports were not based on all of the information known to them.

106.    These fraudulent claims resulted in Sava obtaining and keeping Medicare funds that it was not entitled to receive, for care that was neither reasonable nor medically necessary. Sava had an obligation to repay Medicare all amounts billed to and received from Medicare and TRICARE for levels of care that were not medically reasonable or necessary.

107.    Sava did not repay Medicare any of the amounts it billed Medicare for such services knowing it was not entitled to the money received from these bills.

## IV. FACTS RELATING TO COUNTS IV AND V, RETALIATION AGAINST AND WRONGFUL TERMINATION OF RELATOR TERRENCE SCOTT

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
FILED UNDER SEAL
Page **26** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 26 of 36 PageID #: 80

108.   During his tenure at Sava, Mr. Scott opposed and raised concerns about Sava's practices designed to fraudulently increase Medicare revenue and, upon information and belief, TRICARE revenue.

109.   Mr. Scott began working at Sava as a Rehab Program Manager of its Pleasanton North location on September 21, 2009. In June of the following year he began managing both Pleasanton North and South; in November of that year, he moved to manage only Pleasanton South, as Roy Balderas was hired to manage Pleasanton North.

110.   On August 1, 2011, Mr. Scott became dissatisfied with his position, and stepped down from management to fill the vacant position of Certified Occupational Therapy Assistant at Pleasanton South.

111.   On February 20, 2012, Mr. Scott began filling in for Frank Muñoz as Rehab Program Manager of Pleasanton South while Mr. Muñoz recovered from surgery.

112.   Shortly thereafter, on February 27, 2012 Regional Rehab Manager Wanda Martinez inadvertently gave Mr. Scott Mr. Olivares' ROX Audit email. *See supra at ¶ 65 et seq.* Mr. Scott replied to this email, objecting to Mr. Olivares' changes because he knew none of the patients, and because he, a member of management, was "directing licensed therapists to deliver 70 minutes of therapy to a patient that can only tolerate 35 to 40 minutes of therapy." Mr. Scott asserted that as long as he was filling in for Mr. Muñoz, he would not accept Mr. Olivares' changes; he also offered to revert to his treating therapy position if this was not acceptable to Ms. Martinez. Mr. Scott then deleted Mr. Olivares' changes to the patient charts.

113.   In or around the beginning of March 2012, Mr. Scott had a discussion with Interim Administrator Britt Jung regarding the February 27, 2012 email, and complained that he

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **27** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 27 of 36 PageID #: 81

was being pushed to provide unnecessary service in order to increase Sava's Medicare reimbursement. Mr. Jung warned Mr. Scott not to share the email with anyone.

114. On March 29, 2012, Mr. Muñoz returned, and Mr. Scott ceased back-up managing Pleasanton South.

115. On April 5, 2012, Mr. Scott received a disciplinary action record for purportedly missing OT treatments with two patients, which, according to Frank Muñoz, affected their assessments. Mr. Scott received the disciplinary action record on the same day he was terminated.

116. Mr. Scott protested the disciplinary action, explaining that one of the patients refused treatment, and actually used profanity to do so when he was asked to participate in his therapy. The other patient, Mr. Scott explained in writing, was out of the building for dialysis.

117. Mr. Muñoz responded with a "corrective action" explaining to Mr. Scott that he needed to treat patients as ordered and scheduled, "especially with regard to how treatments (missed visits) impact resident assessments, considering his experience as a rehab manager."

118. Mr. Scott believes that the stated reasons for the disciplinary action were pretextual, and that he was instead targeted for retaliation based on his criticism and refusal to comply with Mr. Olivares' changes to Medicare patients' therapy plans.

119. On the same day, Mr. Scott was terminated for the alleged infractions that were the subject of the disciplinary action described above, as well as other pretextual reasons, including insubordination and engaging in conduct that compromised company reputation.

120. During his termination meeting Mr. Olivares confirmed that Mr. Scott was being terminated because he "missed an RU." Mr. Scott explained the reasons he missed the two visits

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **28** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 28 of 36 PageID #: 82

at issue, *see supra* at ¶ 116, and Mr. Olivares asked Mr. Scott if he was aware that the missed visit with one patient was "the difference between an RU" and an RV. Mr. Scott responded that he was not.

121.     Mr. Olivares explained that "Wanda is under the gun" with respect to RUG targets, and that the whole region was underperforming, according to Wanda's boss, Mary, the district manager, who was under pressure from her boss, Stacy Hallissey, the VP of Rehabilitation. Mr. Olivares explained that they were attempting to avoid a "Change in Therapy," or a decreased RUG score as a result of therapy minutes or disciplines falling below the desired level. He said that "if we commit to an RU, certainly we don't want to have a change in therapy."

122.     Mr. Olivares also relayed Wanda's remarks that the region is underperforming with respect to RUs, and that "considering that he was a manager before, he should know [about] missing RU visits."

123.     Mr. Olivares asked Mr. Scott for his perspective, and Mr. Scott explained that "the patient has the right to refuse treatment... he did not want to do therapy because it hurt, and that's his right." Regarding the other patient, Mr. Scott noted that he waited for over an hour to treat the patient while she was receiving dialysis, and that the missed visit did not affect her RUG.

124.     Mr. Olivares agreed that the patients "of course have that right," but explained that Mr. Scott was being terminated because "of the processes we have to follow" with respect to RUGs.

125.     He then went on to explain that Mr. Scott was "implicated as being on the wrong

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **29** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 29 of 36 PageID #: 83

side of" colleague-to-colleague interactions, and that Mr. Scott was apparently "stirring the pot" with other colleagues. Mr. Olivares said Mr. Scott is "incompatible with what we're trying to do as a whole," and explained that "this is coming from Wanda."

126.    Mr. Olivares also told Mr. Scott he was fired because other employees reported that he told them that Sava's conduct was "unethical, illegal" and that he "said some things that were highly negative about the company." Mr. Scott asked to see written copies of the other employees' statements, and Mr. Olivares refused.

127.    Mr. Olivares nevertheless offered him a PRN job with a higher hourly rate if he were to resign. Mr. Scott said he would have to think about it after seeking medical attention for his back, which he injured that day treating a patient. Mr. Olivares explained that if Mr. Scott wanted to accept that offer, he could hand him back the terminating disciplinary action record, which indicates that he was fired without eligibility to be rehired.

128.    According to the terminating disciplinary action record, Mr. Scott was terminated because this behavior could "be seen as hurtful and seditious." In other words, Mr. Scott was terminated for speaking out against and acting to correct Mr. Olivares, Ms. Martinez's, and Sava's fraudulent practices of inflating its Medicare patients' RUG scores and therapy units in order to maximize reimbursement. The other purported bases for terminating Mr. Scott were pretextual.

## COUNT I
## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE OR FRAUDULENT CLAIMS (31 U.S.C. §3729(a)(1)(A))

129.    Relator re-alleges and incorporates by reference the allegations in paragraphs 1-128 above.

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **30** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 30 of 36 PageID #: 84

130. Through the acts described above, Sava knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S.C. §3729(a)(1)(A), specifically, claims for payment to Medicare and TRICARE for medically unreasonable and unnecessary rehabilitation therapy.

131. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT II
## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE RECORDS & STATEMENTS (31 U.S.C. §3729(a)(1)(B))

132. Relator re-alleges and incorporates by reference the allegations in paragraphs 1-131 above.

133. Sava knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including false Minimum Data Sets.

134. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT III
## SAVA'S RETENTION AND CONCEALMENT OF OVERPAYMENTS IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)

135. Relator restates and incorporates by reference paragraphs 1 through 134 of the Complaint as if fully set forth herein.

136. As set forth above, Sava knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the United States by failing to repay amounts

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **31** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 31 of 36 PageID #: 85

received from Medicare for skilled nursing and therapy services that it knew were not eligible for payment by Medicare under the applicable statutes, rules, and regulations. Sava knew that it was not entitled to moneys paid by Medicare for upcoded claims for payment, and knew that the services it provided and billed to Medicare were in fact not properly payable by Medicare, but concealed and avoided its obligation to repay such amounts.

137.    By virtue of Sava's knowing concealment and avoidance of its obligation to pay money to the United States, the United States has suffered damages.

138.    Sava is liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Sava.

## COUNT IV
### RETALIATION AGAINST RELATOR TERRENCE SCOTT IN VIOLATION OF 31 U.S.C. § 3730(h)

139.    Relator restates and incorporates by reference paragraphs 1 through 138 of the Complaint as if fully set forth herein.

140.    Sava retaliated against Mr. Scott by, among other things, terminating him, as a result of his lawful acts done in furtherance of this action, including refusing to engage in Sava's fraudulent and illegal scheme to maximize Medicare reimbursements. On April 5, 2012, Mr. Scott was discharged from his employment in violation of 31 U.S.C. § 3730(h).

141.    As a direct and proximate result of this unlawful and discriminatory discharge, Mr. Scott has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to find alternative employment, in an amount to be proven at trial.

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **32** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 32 of 36 PageID #: 86

142.    Pursuant to 31 U.S.C § 3730(h), Mr. Scott is entitled to litigation costs and reasonable attorney's fees incurred in the pursuit of his retaliation claim.

**COUNT V**
**WRONGFUL TERMINATION OF RELATOR TERRENCE SCOTT**

143.    Relator restates and incorporates by reference paragraphs 1 through 142 of the Complaint as if fully set forth herein.

144.    In addition, or alternatively, to retaliation in violation of 31 U.S.C. § 3730(h), Mr. Scott alleges a *Sabine Pilot* wrongful termination action against Sava. In *Sabine Pilot Services v. Hauck*, 687 S.W.2d 733 (Tex. 1985), the Texas Supreme Court created a common-law cause of action against employers who discharge an at-will employee because the employee refused to perform an illegal act.

145.    Sava employed Mr. Scott at-will. During his employment, Sava requested Mr. Scott perform illegal acts as a condition of keeping his job. These illegal acts included directing Mr. Scott to fraudulently inflate its Medicare patients' RUG scores and therapy units in order to maximize reimbursement to Sava in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) & (B), 18 U.S.C. § 371, and 18 U.S.C. § 1035. Violation of these statutes is subject to punishment of up to five years in prison and a fine calculated under the United States Sentencing Guidelines. *See* 31 U.S.C. § 3729, 18 U.S.C. §§ 371, 1035, and 287. Sava terminated Mr. Scott's employment solely because he refused to perform these illegal acts.

146.    Sava's wrongful conduct resulted in injury to Mr. Scott, which caused him to suffer actual damages (front and back pay) and mental anguish (past and future).

147.    Because Sava acted with malice, Mr. Scott is entitled to exemplary damages under Section 41.003(a) of the Texas Civil Practice & Remedies Code, because Sava was

engaging in fraudulent activities, *see above*, and was in the act of committing the offenses listed below:

    a. **False Statements Relating to Health Care Matters** – 18 U.S.C. §1035 (applies to all private and public health care programs).

    b. **Conspiracy to Defraud the United States** - 18 U.S.C. §371.

    c. **Health Care Fraud** - 18 U.S.C. §1347 (applies to all private and public health care programs) (amended by §10606 of the Affordable Care Act).

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Sava for Counts I-IV, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Sava presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable Attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(e) That this Court award such other and further relief as it deems proper;

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **34** of **36**

Case 3:15-cv-00404    Document 5    Filed 02/18/14    Page 34 of 36 PageID #: 88

(f)     That this Court enter judgment against Sava in an amount equal to twice the economic damages Relator has suffered, plus full damages for his mental anguish, suffering, and humiliation, including damages for future lost wages and benefits as a result of the unlawful discharge of his employment with Sava and other retaliatory action in violation of 31 U.S.C. §3730(h);

(g)     That this Court award relator both compensatory and exemplary damages for wrongful termination in accordance with *Sabine Pilot Services v. Hauck*, 687 S.W.2d 733 (Tex. 1985) and *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 661 (Tex. 2012), as corrected (June 8, 2012).

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated: 2/18, 2014

Respectfully submitted,

**WATERS & KRAUS LLP**

By: _____

Loren Jacobson
Caitlyn Silhan
3219 McKinney Ave.
Dallas, TX 75204
Telephone:  (214) 357-6244
 and (800) 226-9880
Facsimile: (214) 357-7252
ljacobson@waterskraus.com
csilhan@waterskraus.com

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **35** of 36

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 35 of 36 PageID #: 89

Dan Hargrove
600 Navarro St., #500
San Antonio, TX 78205
Telephone: (210) 349-0515
Facsimile: (210) 349-3666
dhargrove@waterskraus.com

**THE MCKINNEY LAW FIRM, P.C.**

Christopher McKinney
110 Broadway, Suite 420
San Antonio, TX 78205
Telephone: (210) 832-0932
Facsimile: (210) 568-4101
chris@themckinneylawfirm.com


Attorneys for Plaintiff/Relator

*United States ex rel. Terrence Scott v. SavaSeniorCare Administrative Services, LLC*
FIRST AMENDED FEDERAL FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**
Page **36** of **36**

Case 3:15-cv-00404   Document 5   Filed 02/18/14   Page 36 of 36 PageID #: 90